FRED HARDT, JR., APPELLEE, V. BENJAMIN F. ORR, APPEL-
LANT.
6 N. W. (2d) 589

FILED DECEMBER 4, 1942.   No. 31438.

*Morrow & Miller*, for appellant.

*Mothersead & Wright* and *Lewis F. Shull*, contra.

Heard before SIMMONS, C. J., EBERLY, CARTER, MESS-MORE and YEAGER, JJ.

EBERLY, J.

This is a suit in equity. Plaintiff is the owner of an island in the North Platte river known as "Long Island." The immediate cause for bringing this suit was occasioned by defendant Orr erecting a fence on lands claimed by plaintiff as constituting a part of this island owned by him, and artificially changing the course of the waters flowing in the channel north of the island casting it upon and against the shore line thereof., Plaintiff's amended petition described his ownership of the island; alleged that at the time of the original government survey it contained more than 160 acres of land, and was separately surveyed by the United States, platted and divided into lots, and opened to homestead entry; that plaintiff succeeded to the title thereof by mesne conveyances; that defendant claims part of plaintiff's island and built fences thereon; and that he has dammed up certain channels of the river so as to cast water down on part of plaintiff's island and wash it away. The prayer of plaintiff's amended petition is that plaintiff may be decreed to be the owner of the island as described in his petition; that plaintiff's title thereto may be quieted against defendant and all persons claiming by, through, or under him; that the defendant be perpetually enjoined from going upon said land or erecting any fences thereon or in any manner trespassing thereon; that the defendant be also enjoined from keeping or maintaining any dams or obstructions of any kind, nature, or description in the channel of the North Platte river, and also be enjoined from in any manner diverting the flow of the north channel of the North Platte river so that the same is cast upon the lands of this plaintiff; and that a mandatory injunction issue commanding defendant to remove the

obstructions, car bodies, and dams heretofore placed by defendant in such channel.

The ownership by plaintiff of this island, its survey by the government, and that it is separated from the north bank of the North Platte river by the main channel of that river are admitted by the defendant's answer. The defendant denies the placing by him of dams or obstructions in the main channel of said river lying to the north of the island and causing the waters thereof to be diverted so as to wash the banks of the island. The defendant's answer, as amended during trial, contained the further allegation that, "for more than fifteen years last past, and for more than ten years prior to the commencement of this action, he has maintained a fence along the north edge of what is now the main stream flowing across section 27, township 21 north, range 53 west of the 6th P. M., and has had the open, notorious, and uninterrupted adverse possession of all of the land in said section north of said fence, during all of which time he claimed to be the absolute owner of said real estate."

The defendant as his "further answer, affirmative defense and cross-petition against the plaintiff" sets forth his ownership of lots 1, 2, 3, and 4 in section 27, township 21 north, range 53 west; sets forth the alleged boundaries thereof and the conditions of such lots and the changes therein occasioned by the impounding of the waters of the North Platte river in large reservoirs constructed in the state of Wyoming; and alleges that, "as a result of the changed condition of said river, the boundary between said island and the land owned by this defendant * * * is now, and since plaintiff became the owner of said island, has been in dispute." Defendant prays that the boundary between the land owned by plaintiff and the above described land owned by defendant be ascertained, determined, and be permanently established, and that plaintiff's petition be dismissed, and for other and further relief as may be just and equitable.

To this answer and cross-petition plaintiff replied, ad-

mitting the ownership of the lands described in paragraph 1 of defendant's cross-petition; also admitting the construction many years ago of large reservoirs in the state of Wyoming; denying each and every allegation not in the reply expressly admitted, and renewing the prayer as set forth in his amended petition.

A trial of the issues thus joined was had, and the proof of the parties to the action was received, on consideration of which on July 23, 1941, the district court for Scotts Bluff county found the allegations of plaintiff's petition to be true, and determined such issues as set forth in his answer and in his cross-petition adversely to the contentions of the defendant. The court also adjudged that the defendant had been guilty of repeated trespasses upon the lands of plaintiff, and had also "unlawfully dammed off and diverted and deflected channels and streams" as in plaintiff's amended petition set forth. That court also determined and established the true boundary between the island owned by plaintiff and described in his amended petition and the lands of the defendant in section 27, township 21 north, range 53 west of the 6th P. M., and, as to the lands situated south of the boundary line so determined and established, quieted the title thereof in plaintiff. This decree also enjoined any further trespasses by defendant upon the lands so adjudged to be the property of plaintiff. On July 25, 1941, defendant filed his motion for a new trial. On September 23, 1941, defendant filed his further motion for a new trial on the ground of newly discovered evidence. These motions for a new trial were on January 15, 1942, overruled by the district court, from which order this appeal is prosecuted.

In this court appellant challenged the judgment entered by the district court as unsupported by the pleadings, and not sustained by the evidence; and, in addition, that the trial court erred in the denial of defendant's motion for a new trial on the ground of newly discovered evidence.

In the instant case, however, the ownership of the island and accretions thereto is properly alleged in plaintiff's

pleading, and the quieting of the title thereto constitutes a part of the prayer of his petition. It further appears that one of the primary objects of the litigation in the instant case is to compel the removal of encroachments by defendant upon and against plaintiff's premises and to enjoin his repeated trespasses thereon, which involve only as an incident the determination of the boundary line between the lands of each. *Aborn v. Smith,* 11 R. I. 594; *Caleo v. Goldstein,* 134 App. Div. 228, 118 N. Y. Supp. 859. It also appears that the defendant in this suit in equity, as his "answer and cross-petition" under section 34-301, Comp. St. 1929, to determine a disputed boundary, conformed his pleadings to the requirement of that section, and has asked as affirmative relief that the boundaries of the disputed tract of land be established as set forth in his answer and in his cross-petition. *McDowell v. Carothers,* 75 Or. 126, 146 Pac. 800. In addition, it further appears that defendant in his answer specifically pleaded "open, notorious and uninterrupted adverse possession" of a substantial portion of the *locus in quo* here in suit, and that his answer and cross-petition contains appropriate prayer for relief based on these allegations herein referred to.

The maxim of equity applicable to the situation thus presented by the parties in their several pleadings is that "Equity delights to do justice, and that not by halves." This embraces the well-established doctrine that, "When equity once acquires jurisdiction it will retain it so as to afford complete relief." 21 C. J. 198.

It follows that, in view of the situation presented by the pleadings, the defendant is precluded from objecting to the jurisdiction of equity to fully determine the issues joined thereby including the disputed boundary lines involved. Further, also, defendant is precluded from challenging the sufficiency of plaintiff's pleadings to support the judgment entered by the district court in this cause. It necessarily follows that the judgment entered in the instant case, in view of the issuable facts contained and alleged in the pleadings, must be deemed to be fully supported thereby.

It appears fairly established by the record in this case that in a state of nature the waters carried by the North Platte river past Long Island were regularly subjected to extreme fluctuation. Due to the sandy nature of its bed, the terrain through which its course was situated, and the source of its supply, there annually occurred in this river a season of high water and a season of low water. During the flood water season, which usually occurred during the months of June or July, the waters carried by this stream covered the entire bed of the river between the north bank thereof and the shores of Long Island, even "right up to the tops of the banks." During low water period the waters carried would gradually diminish in volume exposing its bed of sand until only two channels remained, one south of Long Island, the other, the larger and deeper channel situated near and along and parallel to the north high bank of the North Platte river at this point. Defendant's engineer who became acquainted with the North Platte river first in 1893, testifying as a witness, says in part:

"Q. When you first knew the river in this vicinity it was as a boy? A. Yes, sir. * * * Q. At that time in times of high water the river would be full from bank to bank? A. Yes, sir. Q. They had dry years then sometimes? A. Oh, yes, the same as they do now. Q. And there was also dry seasons in the years? A. Yes, sir. Q. After the time of the high water the water would commence going down in the river? A. Yes, sir. Q. And it would no longer be full from bank to bank? A. That's right. Q. So it was only on occasions of extreme high water that was full from bank to bank, isn't that correct? A. Yes, sir. Q. And then in normal times of water it would divide into channels? A. Yes, sir, that is right. Q. So normally at what we might call 'mean water' there was at least two channels in the river, and probably more? A. Yes, sir. Q. Then as the water got lower and lower the number of channels that were flowing water would decrease? A. Yes, sir. Q. Now, in the vicinity of Long Island, which is the island in question, it is your recollection that in extreme

low water it would get down to a channel on the north and one on the south? A. Yes, it would. Q. That was what would happen in extreme low water? A. Yes, sir."

The district court, by its decree entered in this case, in effect determined and fixed the true boundary line between the lands of the parties to this litigation as the middle or thread of the deep water channel as it existed in a state of nature from time immemorial during periods of low water immediately south and parallel to the north high bank of the stream forming the south boundary of the lands of defendant. This line is specifically described in the decree entered. The title of the lands lying south of this boundary is quieted in plaintiff, and defendant is perpetually enjoined from damming up or diverting any of the channels or streams of water on the lands of the plaintiff, and also enjoined from erecting dams, deflecting works, or diversion works that will change the flow of water in any of the streams in or on the plaintiff's land south of the boundary line as by the trial court fixed and determined.

The parties to this litigation are in agreement that grants of land bounded upon rivers carry with them the exclusive right and title of the grantees to the center or thread of the stream, unless the terms of the grant clearly denote an intention to stop at the bank or margin of the river. *Haney v. Hewitt*, 105 Neb. 746, 181 N. W. 861; *Wiggenhorn v. Kountz*, 23 Neb. 690, 37 N. W. 603; *McBride v. Whitaker*, 65 Neb. 137, 90 N. W. 966; *Kinkead v. Turgeon*, 74 Neb. 580, 109 N. W. 744.

In this connection, this jurisdiction is committed to the view: "Where title to an island in a nonnavigable stream is conveyed to a grantee by government patent, and the land so conveyed is bounded by the waters of such stream, the grantee's ownership carries with it the bed of the river to the center or thread of each surrounding channel." *Higgins v. Adelson*, 131 Neb. 820, 270 N. W. 502. See, also, *Wiggenhorn v. Kountz, supra.*

One of our accepted texts on the law of water rights em-

ploys this language: "The law of riparian rights grows out of this exclusion of nonriparian owners because they have no access to the water. The right of access is, in the end, a determinative factor in all systems of water law." 1 Wiel, Water Rights in Western States (3d ed.) 759.

In *Horton v. Niagara, Lockport & Ontario Power Co.,* 231 App. Div. 386, 247 N. Y. Supp. 741, it is stated, in part:

"In order to determine just where the center of the channel is, it is necessary to determine what constitutes such center line—the *filium acquæ*, as it is so often called in the older decisions. Plaintiffs contend that this line is midway between the banks of the river at the ordinary height of the water, without regard to the contour of the channel. Defendant insists that the thread of the stream is the line to which the water would finally recede, just before it entirely ran out or evaporated. That line would depend upon the location of the low and deep parts of the channel, which many times would be upon one border or the other of the stream, and seldom, if ever, in its exact geographical center.

"Water always seeks its lowest level. If the deepest part of a channel is well to one side, and the equidistant rule is applied, the riparian owner upon the shallow side would, in times of drouth, be shut off from access to the water which is supposed to flow past his door, without trespassing upon the lands of his neighbor, as the exact middle of the stream would be on dry land. In the very nature of things, the thread or center of a stream must be the line which would give to the owner upon either side access to the water, whatever its stage might be, and particularly at its lowest flow. Upon principle, therefore, it would appear that the thread of a nonnavigable river is the line of the water at its lowest stage. The weight of authority, in this state at least, upholds such contention. *Halsey v. McCormick,* 13 N. Y. 296; *Child v. Starr,* 4 Hill, 369, 380; *Ex parte Jennings,* 6 Cow. 518; *People v. Canal Appraisers,* 13 Wend. 355; *Micelli v. Andrus,* 61 Or. 78, 89."

We have, in effect, adopted the foregoing reasoning of

the New York courts and have announced the rule applicable in this state as follows: "The thread or center of a channel, as the term is above employed, must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow." *Higgins v. Adelson, supra.*

The pleadings in this case admit that the plaintiff became the owner of Long Island by mesne conveyances from the original patentees. There is no contention that the original patents here involved or any of the mesne conveyances through which plaintiff claims contained any provisions denoting "an intention to stop at the bank or margin of the river." It is obvious that the original patentees of Long Island received title to the "thread of the stream" as the meaning of that term is above determined.

As meeting a further contention of defendant, it may be said that patents upon which plaintiff's title is based embody and include in legal effect a call for the thread of a stream as a boundary of the lands conveyed thereby. "A specific call for the thread of a stream fixes the thread as the boundary, and in case the stream has two channels the thread of the main channel is the limit." 11 C. J. S. 575, sec. 31.

It is true that at the time of the trial of this case in the district court the principal channel between Long Island and defendant's lands in which the waters of the North Platte river then flowed was situated south of the boundary line as fixed by that tribunal. It is also true that the construction of irrigation works and other projects of internal improvement has materially diminished the ordinary flow of the North Platte river. But it also appears from a fair preponderance of the evidence that the diversion of the original main channel of this river from its original location north of Long Island to its present situation was accomplished by and through dams and diversion works unlawfully constructed and unlawfully maintained by the defendant in the channels of the North Platte river upon lands owned by plaintiff and without plaintiff's

consent, and that the changes of location thus made occurred within ten years last past and within the statutory period of limitations, and were wholly ineffective to alter or change the boundary line as previously existing. *Courter v. Lincoln Park*, 101 N. J. Eq. 572, 138 Atl. 99.

The evidence as an entirety fails to sustain the defendant's claims of adverse possession as in his pleadings alleged.

We are also unable to accept defendant's contention that the trial court erred in overruling defendant's motion for a new trial based on the ground of newly discovered evidence. The facts relating to this subject disclosed by the record invoke the application of the following rules: "A motion for a new trial on the ground of surprise is properly overruled, where a request for a continuance for that reason was not made at the trial," and also, "Newly discovered evidence is not a ground for a new trial, where the exercise of due diligence before the trial would have produced it." *Hahn v. Doyle*, 136 Neb. 469, 286 N. W. 389. See, also, *Bonacorso v. Camden Fire Ins. Ass'n*, 130 Neb. 203, 264 N. W. 442.

It follows that the decree and judgment as entered by the trial court is amply sustained by the record, and, on consideration thereof *de novo*, the same is, in all respects, affirmed.

AFFIRMED.